FILED
COURT OF APPEALS
DIVISION II

2013 JUL 30  AM 10: 33

STATE OF WASHINGTON

BY_____
        DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 43034-7-II |
| Appellant, | |
| v. | |
| TANNER ZACHARY ROY RUSSELL, | UNPUBLISHED OPINION |
| Respondent. | |

HUNT, J. – The State of Washington appeals the superior court's suppression of evidence and pretrial dismissal of drug possession charges against Tanner Zachary Roy Russell. The State argues that the superior court erred in ruling that the initial protective frisk was improper and that the officer's opening of a box found during the frisk was unjustified because (1) the lone officer's protective weapons frisk of Russell after a traffic stop was objectively reasonable; (2) the officer's removal of the box from Russell's pocket and opening of the box were reasonable based on the officer's belief that it might contain a small weapon such as the one Russell had possessed and lied about during a contact the preceding week; and (3) in the alternative, Russell consented to the officer's removal and opening of the box. Holding that the protective weapons frisk and opening of the box were reasonable under the circumstances, we reverse the superior court's suppression of evidence found in the box and remand for trial.

## FACTS

### I. STOP AND SEARCH

On August 28, 2011, Centralia Police Officer Derrick Makein came in contact with Tanner Zachary Roy Russell. Although Russell denied being armed, in his right pants pocket another officer found a "thin, lightweight [.22 caliber] pistol that could be fully concealed in the palm of one's hand," loaded with one bullet. Clerk's Papers (CP) at 73 (Findings of Facts (FF) 1.13). The officers apparently confiscated the pistol and issued Russell a misdemeanor citation.

The next week, on September 5, Makein was on night patrol when a bicycle with no light[1] rode past him in the opposite direction and crossed over into the opposing traffic lane. Makein followed the bicycle into a nearby well-lit AM/PM parking lot located on "one of the busie[st]" streets in the city. CP at 72 (FF 1.6). Makein told the cyclist that he (Makein) was detaining him (the cyclist) for the traffic infractions of "riding a bicycle after darkness and for his lane travel" and that he was not free to leave. CP at 72 (FF 1.8). Recognizing the cyclist as Russell, from the previous week's contact, Makein asked if he had reclaimed his gun; Russell responded that he had not.

Russell appeared a bit "jumpy," but he was cooperative and made no threatening or furtive movements or gestures. Verbatim Report of Proceedings (VRP) at 28. Aware that Russell had previously falsely denied possessing a weapon, however, Makein told Russell that he was going to "frisk him for a weapon" for officer safety reasons. VRP at 16. During the frisk, Makein felt "a . . . hard boxy type . . . item" in Russell's right front pants pocket; the item was

---

[1] RCW 46.61.780 requires that bicycles being ridden after dark be equipped with a visible front-mounted headlamp.

approximately six-inches long, four-inches wide, and one-to-two inches deep. VRP at 18. Makein realized that the item itself was not a weapon; but he was concerned that it was large enough to contain a weapon similar to the small gun Russell had been carrying on August 28 or some other unspecified weapon. Russell told Maken that the item was a box.

Makein asked Russell if he "mind[ed]" if he (Makein) removed the box from his pocket; Russell replied that it would be "[o]kay." VRP at 18, 19. Makein then asked Russell if he would consent to Makein's searching the box; according to Makein, Russell did not "appear to have any problem" with that. VRP at 19. The box was a case for a Mini Maglite® flashlight; apparently it was not locked. Concerned that the box could contain a small, lightweight, loaded firearm or other "weapon that [could] harm [him]," Makein did not shake it before opening it. VRP at 20. Inside the box, Makein found a syringe filled with methamphetamine.

## II. PROCEDURE

The State charged Russell with unlawful possession of methamphetamine. Russell moved to suppress the syringe and its contents. At the suppression hearing, Makein testified as described above; but he denied having asked Russell whether he had recovered his gun after the August 28 contact. The superior court questioned Makein about whether any potential danger had dissipated once he had the box in his hand. Makein admitted that, although any potential danger was "gone" once he had the box, he still had safety concerns because Russell had previously lied about not possessing a small hidden weapon, he (Makein) was alone during this stop, and Russell was not restrained. VRP at 39.

3

Russell testified that, before the weapons patdown, Makein had asked if he had retrieved his gun from the previous encounter and that he had answered, "No." VRP at 42. Russell did not controvert Makein's testimony that he (Russell) had consented to the removal and search of the box's contents during the stop and frisk at issue.[2]

The superior court granted Russell's motion, suppressed the methamphetamine, and entered the following pertinent written findings of fact (FF) and conclusions of law (CL):

## I. FINDINGS OF FACT

. . .

1.7 Based upon observing the bicyclist having no headlamp [at night] and [the] lane travel in the opposite lane, Officer Makein decided to make a traffic stop and turned his vehicle around. Once he caught up to the bicyclist, Officer Makein made the traffic stop in the AM/PM parking lot.

1.8 Officer Makein got out of his patrol vehicle and told the bicyclist that he was being stopped and detained for the traffic infractions of riding a bicycle after darkness and for his lane travel.

1.9 Almost immediately after telling the bicyclist why he was being stopped, Officer Makein recognized the bicyclist from a prior investigation as the above-named Defendant Tanner Russell.

1.10 On August 28, 2011 after midnight, Officer Makein stopped a motor vehicle in which the Defendant was a passenger for an equipment violation.

1.11 The driver of the vehicle in the August 28 incident had a felony warrant for her arrest and further investigation revealed that the driver and Defendant were in possession of burglary tools. The investigation and interview with the female

---

[2] After the superior court advised that it was suppressing the evidence because the initial frisk was invalid, the State raised the issue of Russell's consent to the removal and search of the box. The superior court agreed that Makein had testified that there was consent, that Russell did not contradict that testimony, and that this was not a matter of contention "for the purpose of the record." VRP at 62. The superior court also stated, however, that because it was suppressing the evidence based on the invalidity of the initial frisk, it did not reach the issue of whether Russell's consent would have been sufficient.

driver revealed that the Defendant and female driver were casing a car and a place in the area to go back to later to steal a car.

1.12 During the criminal investigation on August 28 into the burglary tools the Defendant was detained and questioned by Officer Makein. During the questioning of the Defendant, Officer Makein asked the Defendant very clearly on two separate occasions whether he had any weapons on his person and the Defendant lied and said he did not.

1.13 During the August 28 incident while Officer Makein was present, another officer frisked the Defendant for weapons and found a very small two chamber .22 caliber pistol (Derringer type) that was loaded with one round in the Defendant's right pant[s] pocket. The pistol was a thin, lightweight pistol that could be fully concealed in the palm of one's hand. The pistol appeared to be designed for close range shooting.

1.14 During the prior stop on August 28, 2011, the Defendant did not try to reach for the gun, was not violent in any way, was not belligerent in any way, and the result of the August 28, 2011 incident was the issuance of a misdemeanor citation.

1.15 Exhibits 3, 4 and 5 that were admitted into evidence fairly and accurately depict the very small two chamber .22 caliber pistol (Derringer type) that was located on the Defendant's person on August 28, 2011.

1.16 On September 5, 2011, when Officer Makein recognized that the bicyclist was the Defendant and someone that had lied about having a loaded gun on him eight days earlier, Officer Makein told the Defendant that he was going to search him for weapons for officer safety reasons. Officer Makein asked the Defendant, "Did you go and get your firearm back yet?" and the Defendant replied, "No. I don't want nothing to do with it." That conversation took place prior to the search.

1.17 At the time of the stop, however, Officer Makein had no knowledge or information that the Defendant was a felon or a violent felon.

1.18 In deciding he reasonably believed the Defendant may be presently armed, Officer Makein considered: that the previous August 28 incident was still fresh in his mind, he was concerned about the Defendant's prior deception, the time of day, the fact that there were no other officers present with him, and that the gun found previously was small enough to be readily concealed and could result in a lethal shot if used at close range. Officer Makein testified that he was also concerned that the Defendant could not only be presently armed with a handgun,

but also with a weapon that could harm him, but what that weapon could have been was not identified by Officer Makein.

1.19 Officer Makein began to frisk the Defendant for weapons and in the Defendant's right front pocket he felt a hard boxy type item that was approximately six inches in length, four inches in width, and an inch or two deep.

. . .

1.21 Officer Makein believed the box felt large enough to contain a weapon such as found on the Defendant's person on August 28[, 2011] as well as another weapon that could harm him.

1.22 Based on the initial feel of the case, Officer Makein felt he was not able to immediately eliminate the contents of the case as a possible threat and believed he needed to check what was in the box for his safety.

1.23 At the time the frisk was occurring, Officer Makein was the only officer present. During the initial contact the Defendant appeared somewhat nervous. The road that the Defendant had been traveling the opposite direction is one of the busiest thoroughfares in Centralia, but not too busy late at night.

1.24 Officer Makein then asked the Defendant what the object was and the Defendant said it was a box. However, when the case was felt by Officer Makein, he knew that the box itself was not a weapon.

1.25 Once the case was in the officer's hands, Officer Makein testified that any perceived danger of what may have been in the case was eliminated.

1.26 Officer Makein then asked the Defendant if it was okay if he removed the case from the Defendant's pocket and search the case's contents. The Defendant gave voluntary consent to have the case removed from his pocket and searched.

1.27 Based upon the dimensions of the box Officer Makein believed it could have contained a weapon such as the Derringer type pistol seized on August 28, 2011.

1.28 The pistol from the August 28, 2011 incident appeared to be an older type pistol and did not have any sort of trigger guard.

1.29 Officer Makein did not shake the case prior to opening it because of a concern that the case might contain a loaded firearm.

1.30 Because of the very small size of the pistol (Derringer type) from the prior incident and the size of the case that he was holding, Officer Makein believed the case could contain a weapon that could harm him although he stated that the syringe weighed only a fraction of what the pistol weighed.

1.31 Once the case was opened, Officer Makein located a syringe full of methamphetamine. This evidence found in the case constitutes the entirety of the State's evidence against the Defendant in the above-captioned matter.

1.32 The Defendant was not advised he could withhold his consent to being searched or the container opened following the frisk.

. . .

## II. CONCLUSIONS OF LAW

2.1 Officer Makein had a reasonable suspicion that two traffic infractions were committed by the Defendant. Specifically, riding a bicycle without a headlamp after darkness and improper lane travel.

2.2 Given that Officer Makein had a reasonable suspicion that the Defendant committed traffic infractions, the stop of the Defendant and the initial detention and seizure of the Defendant to enforce those traffic infractions was lawful.

2.3 Officer Makein was only lawfully entitled to detain the Defendant long enough to ask the Defendant for identification, check the Defendant's identification through dispatch, and issue the traffic infractions.

2.4 Other than riding his bicycle without a mounted headlamp and improper bicycle lane travel, Officer Makein had no articulable suspicion of any criminal activity.

2.5 Since there were no movements that could be interpreted as an attempt to retrieve a weapon, since the Defendant made no threatening gestures or words, since the location of the stop was in a busy and well lit area without any evidence that the area was a high crime area, and since there was no other suspicious conduct, the search of the Defendant was unjustified under these particular circumstances.

2.6 Even if the search was justifiable, once the container was removed and in the control of Officer Makein, Officer Makein acknowledged and the Court so concludes that any perceived threat to Officer Makein from the container was

eliminated and the search of it[]s contents was therefore unreasonable and unjustified.

## III. ORDERS

3.1 The Defendant's motion to suppress all evidence found in the case located on the Defendant's person by Officer Makein is hereby granted.

3.2 The Court's Order suppressing all evidence under paragraph 3.1 effectively terminates the State's case prior to trial.

3.3 Since the Court's Order effectively terminates the State's case prior to trial, this criminal matter is hereby dismissed with prejudice as the suppression order of this Court leaves the State with insufficient evidence to proceed.

CP at 72-76. The State appeals.

## ANALYSIS

The State argues that the superior court erred in concluding that (1) Makein's protective frisk of Russell was not justified; and (2) Makein's opening of the box was unreasonable and unjustified, particularly in light of the superior court's contrary finding that Russell voluntarily consented to Makein's removing the box from Russell's pocket and to Makein's opening the box. We hold that the initial protective frisk was justified, that Makein's opening of the box to search its contents for safety reasons was justified, and that evidence should not have been suppressed.[3]

---

[3] Like the superior court, we do not reach the issue of consent to the search of the box; and we do not address Russell's assignment of error to the superior court's finding of fact 1.26—that he voluntarily consented to Makein's removing the box from his (Russell's) pocket and to Makein's opening the box. As the superior court noted, "[T]he evidence wasn't presented," and "[w]e didn't get there." VRP at 63. Consistent with the superior court's observation, we note that, although the superior court found that Russell consented to the search of the box's contents, the evidence in support of this finding is sketchy: When Makein asked Russell if he would consent to searching the box, Russell did not "appear to have any problem" with that. VRP at 19.

## I. STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress to determine whether substantial evidence supports the trial court's factual findings and whether its factual findings support its conclusions of law; "[e]vidence is substantial when it is enough 'to persuade a fair-minded person of the truth of the stated premise.'" *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009) (quoting *State v. Reid*, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999)). We consider unchallenged findings of fact as verities on appeal. *State v. Valdez*, 167 Wn.2d 761, 767, 224 P.3d 751 (2009). We review the trial court's conclusions of law de novo. *Garvin*, 166 Wn.2d at 249.

## II. PROTECTIVE FRISK REASONABLE

The State argues that, despite ruling that Makein's stop and initial detention were proper,[4] the superior court erred in concluding that the protective frisk was not justified. Relying on *State v. Collins*, 121 Wn.2d 168, 847 P.2d 919 (1993), the State contends that, given Makein's knowledge of Russell's having lied about possessing a small pistol a week earlier and the circumstances surrounding the stop, Makein had reasonable safety concerns that justified the protective frisk. We agree.

A nonconsensual, warrantless, protective frisk for weapons is permitted only when a "'reasonable safety concern exists'" and "'an officer can point to "specific and articulable facts" which create an objectively reasonable belief that a suspect is "armed and presently dangerous."'" *State v. Harrington*, 167 Wn.2d 656, 667-68, 222 P.3d 92 (2009) (quoting

---

[4] Russell does not challenge the legality of the initial stop and detention.

*Collins*, 121 Wn.2d at 173 (quoting *Terry v. Ohio*, 392 U.S. 1, 21-24, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968))). "The officer need not be absolutely certain that the individual is armed, only that a reasonably prudent person in the same circumstances would be warranted that their safety, or that of others, was in danger." *Harrington*, 167 Wn.2d at 667-68. "It is always the State's burden to establish" that an exception to the warrant requirement applies. *State v. Afana*, 169 Wn.2d 169, 177, 233 P.3d 879 (2010).

### A. Protective Frisk in *Collins*

The State argues that Russell's case is similar to *Collins*, in which two officers stopped a vehicle for having defective brake lights at about 4:00 AM; one officer immediately recognized Collins from a previous arrest on a felony warrant, ordered Collins out of the car, and "conducted a brief, pat-down frisk of [Collins's] clothing to search for weapons." *Collins*, 121 Wn.2d at 170-71. During the previous arrest, the officer had observed that Collins's truck contained "a large amount of either .38 or .357 ammunition, a holster, and a set of handcuffs in the passenger compartment of the truck," although he had found no weapons in the truck when he had searched it with Collins' consent. *Collins*, 121 Wn.2d at 171 (internal quotation marks omitted).

During the protective frisk for weapons at issue on appeal, the officer encountered a hard object in Collins' back pocket. *Collins*, 121 Wn.2d at 171. Suspecting the object could be a weapon, the officer removed from Collins' pocket a knife with a three-inch blade; a plastic bag containing methamphetamine fell out of the same pocket and the officer arrested Collins for illegal drug possession. *Collins*, 121 Wn.2d at 171-72. Later arguing that the frisk was unlawful, Collins moved to suppress the drug evidence; the trial court denied the motion to suppress. *Collins*, 121 Wn.2d at 172.

10

When Collins appealed, the State argued that the warrantless frisk was a lawful *Terry* "'stop and frisk.'" *Collins*, 121 Wn.2d at 172. Applying a "totality of the circumstances" test to determine whether the frisk was reasonable, our Supreme Court held that "the circumstances were sufficient to support a reasonable belief that the defendant posed a threat to the safety of [the officer] or to the safety of his partner." *Collins*, 121 Wn.2d at 174. In so holding, the Court considered several factors: First, it considered the timing of the stop, which had occurred in the early morning while it was still dark, which darkness impaired the officers' ability to see into the car Collins was driving at the time of the stop, to "observe [the] defendant," or to see if others willing to come to Collins' aid or otherwise interfere were in the area. *Collins*, 121 Wn.2d at 174-75. Second, the Court observed that "an individual who has been stopped may be more willing to commit violence against a police officer at a time when few people are likely to be present to witness it." *Collins*, 121 Wn.2d at 175. Third, the Court considered the officer's knowledge about Collins' previous felony arrest and that at the time of this previous felony arrest, Collins' car had contained a holster and ammunition, suggesting that Collins had access to a gun; the Court weighed these facts in favor of the frisk's reasonableness. *Collins*, 121 Wn.2d at 176.

Noting that where circumstances demonstrate that the officer's information is reliable, the *Collins* Court opined:

> [W]hen combined with other circumstances that contribute to a reasonable safety concern, such information could lead a reasonably careful officer to believe that a protective frisk should be conducted to protect his or her own safety and the safety of others.

*Collins*, 121 Wn.2d at 177. The Court concluded that the officer's reliable information that Collins likely had access to a gun, "combined with the fact that the stop occurred at 4 A.M. and the fact of [the] defendant's prior felony arrest," gave the officer "objectively reasonable grounds to be concerned for his personal safety and the safety of others, including his partner." The Court held that the frisk and the evidence discovered during the frisk were lawful. *Collins*, 121 Wn.2d at 177.

### B. Protective Frisk of Russell

Similarly here, Makein knew that Russell had possessed a small pistol the previous week, that Russell had previously lied to officers about whether he had a gun on his person, that the weapon Russell had been carrying a week earlier was small enough to be easily hidden in the palm of his hand or his clothing, and that the gun was loaded. Moreover, the instant stop had occurred during the dark of night; and, although the area was well-lit with relatively frequent traffic, Makein was alone, in contrast to the multiple officers in *Collins*.[5] Based on these facts and *Collins*, we hold that the superior court erred in concluding that Makein's initial protective frisk of Russell was unreasonable,[6] and we reverse its ruling in conclusion of law 2.5.

---

[5] That Makein's previous contact with Russell had resulted in a misdemeanor charge, rather than a felony as in *Collins*, does not sufficiently distinguish *Collins* for our purposes here.

[6] Contrary to RAP 10.3(a)(6), Russell fails to cite supporting authority for the following arguments, which we, therefore, do not address: (1) that the initial protective frisk was unlawful because the State failed to prove that the August 28, 2011 warrantless frisk a week earlier had been lawful; and (2) that the reasonableness of Makein's concern about possible firearms during his September 5 encounter with Russell was dependent on the lawfulness of the previous week's frisk, which had produced the pistol hidden on Russell's person, possession of which he had falsely denied.

Resolution of the reasonableness and lawfulness of the protective frisk, however, does not resolve the suppression issue before us. Thus, we next address the legality of Makein's removal and opening of the box that he encountered during his protective frisk of Russell.

### III. REMOVAL OF BOX AND SEARCH OF CONTENTS REASONABLE

The State acknowledges, "[I]t has been held that removing objects such as cigarette packs or other small containers to search for miniature weapons, such as razor blades or other small objects that could be used as a weapon is not reasonable." Br. of Appellant at 17 (citing *State v. Horton*, 136 Wn. App. 29, 38, 146 P.3d 1227 (2006), *review denied*, 162 Wn.2d 1014 (2008)).[7] Nevertheless, the State argues here that (1) Makein's removal of the box from Russell's pocket and search of its contents were lawful; and (2) the trial court erred in concluding that, once Makein had the box in his possession, any "perceived threat" was "eliminated and the search of it[ ]s contents was therefore unreasonable and unjustified."[8] CP at 76 (CL 2.6). The State

---

[7] In *Horton*, Division Three of our court held that an officer's search of a cigarette pack for weapons exceeded the permissible scope of a *Terry* frisk for weapons because (1) once the officer removed the cigarette pack from the defendant's clothing, it became clear the object was not a weapon; and (2) there were no facts suggesting that the defendant was likely to be carrying any kind of miniature weapon that could he could have concealed in the cigarette pack. *Horton*, 136 Wn. App. at 37-38.

[8] The dissent asserts Officer Makein never testified that he would have had any safety concerns had he returned the container to Russell after Makein issued the traffic citations. Dissent at 23. But the evidence does not fully support the superior court's finding of fact, contained in its conclusion of law 2.6, that "once the container was removed and in the control of Officer Makein, Officer Makein acknowledged and the Court so concludes that any perceived threat to Officer Makein from the container was eliminated." CP at 76 (CL 2.6). Although Makein did agree with the first part of this recitation, he testified to the contrary and disagreed with the second part of this recitation, as two of the superior court's other unchallenged findings of fact clearly demonstrate:

contends that the removal of the box from Russell's pocket and examination of its contents were reasonable and justified based on Russell's having previously lied to Makein about whether he (Russell) possessed a small, easily-concealable pistol and the reality that Makein would be returning the box to Russell after issuing the traffic infraction.[9] We agree.

We do not disagree with the dissent's explanation of *Horton* in general and our previous conclusion in *Horton* that "the justification for the intrusion ends once [the officer] determines that [the removed container] is not a weapon." *Horton*, 136 Wn. App. at 38, cited by the dissent here at page 21. Nor are we attempting here to expand the scope of a routine *Terry* frisk such that it could be "essentially unlimited, since the tiniest object can conceivably be used offensively." *Horton*, 136 Wn. App. at 38, cited by the dissent here at page 21. But the protective search of the box here was not routine. Thus, we agree with the State that, based on the particular facts of the case before us, *Horton* is distinguishable.

---

1.27 Based upon the dimensions of the box Officer Makein believed it could have contained a weapon such as the Derringer type pistol seized on August 28, 2011.

. . . .

1.30 Because of the very small size of the pistol (Derringer type) from the prior incident and the size of the case that he was holding, *Officer Makein believed the case could contain a weapon that could harm him* although he stated that the syringe weighed only a fraction of what the pistol weighed.

CP at 75 (emphasis added). Although the superior court never entered any finding about Makein's credibility, based on its repeated recitations of Makein's testimony to support its various findings of fact, it appear that the superior court found Makein to have been truthful.

[9] In the alternative, the State argues that even if Makein's removal and opening of the box were not reasonable under the circumstances, the superior court's finding of fact 1.26 that Russell voluntarily consented to Makein's removing the box from his (Russell's) pocket and opening the box establishes that the search was a proper consensual search and, thus, legal. As we have explained in footnote three, we do not address this consent argument.

Unlike in *Horton*, (1) during an encounter with Makein just a week earlier, Russell had possessed and concealed a small, lightweight pistol and had lied to him about his possession of that weapon; (2) thus, when Makein removed the box from Russell's pocket, it was not immediately clear to Makein that the box did not contain a small, easily-concealable weapon; and (3) even though the box was too light to have contained a small pistol of the type that Russell had concealed the week before, based on his previous experience with Russell, Makein's safety concerns were not allayed until he opened the box and determined that it did not contain a weapon. These specific experiential fact-based safety concerns distinguish this protective search from routine traffic stops in which the officer has no specific knowledge or experience with the defendant justifying a heightened degree of caution. Too many officers are injured or killed in routine traffic stops where the officer has no knowledge of the defendant's concealed weapon or propensity for violence; thus, it cannot be unreasonable for an officer who already *knows* of a particular defendant's dangerous propensities to take additional precautions to protect his own safety.

Makein's previous experience with Russell caused this heightened safety concern here and justified Makein's search inside the box to be sure it did not contain a weapon that could be used against him, before returning the box to Russell; this box was *not* a disposable cigarette pack like the one found on Horton. Extending a protective search to a small container under these circumstances does not unreasonably expand the scope of a *Terry* frisk to allow a search of *any* container no matter how small, which was our concern in *Horton* (where the officer apparently had *no prior* threatening contact with Horton involved a very small concealed weapon).

The scope of a protective frisk "is limited to the protective purposes" of the search. *Garvin*, 166 Wn.2d at 250. Here, the protective purposes of the initial frisk continued after Makein removed the box from Russell's person: Makein testified, and the superior court found, that (1) despite the box's small dimensions, it "could have contained a weapon such as the Derringer type pistol" he had seized from Russell a week earlier during their August 28, 2011 encounter, CP at 75 (FF 1.27); and (2) based on the very small size of the pistol Russell had possessed and concealed during the prior incident and the size of the box in his pocket during the instant encounter, Makein "believed the case could contain a weapon that could harm him" (even though the syringe that he eventually found in the box weighed only a fraction of what the pistol had weighed). CP at 75 (FF 1.30). Furthermore, Makein was alone on patrol that night when he stopped Russell, thus, increasing the potential danger if Russell once again was secreting a small weapon on his person.

We recognize that an officer cannot *expand* the scope of a search once he determines that an object is not a weapon. *See Garvin*, 166 Wn.2d at 254-55. But here, Makein was unable to make that determination simply by removing the opaque box from Russell's pocket because he (Makein) could not see into it to verify that it did not contain Russell's small pistol. Although, as the trial court noted, Makein did not have any *immediate* concern for his safety while the box was in his possession, he knew that he would have to return the box to Russell after issuing the traffic citations. Before doing that, however, Makein needed to complete his protective search by determining whether the box contained a weapon that Russell could use to inflict harm.

We hold that (1) under these circumstances, opening the box before returning it to Russell, to determine whether it contained a small pistol, was not an unreasonable expansion of

16

No. 43034-7-II

the initial protective frisk; (2) rather it was reasonable and lawful; and (3) therefore, the superior court erred in suppressing the evidence on this basis. *See State v. Miller*, 91 Wn. App. 181, 955 P.2d 810, 961 P.2d 973 (officer did not exceed scope of protective frisk by searching a three-inch by four-inch by half-inch tin canister taken from handcuffed defendant's pocket when the officer had learned in training that such a container could hold a .22 caliber Derringer pistol), *review denied*, 136 Wn.2d 1016 (1998). Accordingly, we reverse the superior court's conclusion of law 2.6 ruling that removal and search of the box was unreasonable.

We reverse the superior court's suppression of the methamphetamine evidence and its dismissal of the drug possession charge against Russell; and we remand for trial.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Hunt, J.

I concur:

Johanson, A.C.J.

17

QUINN-BRINTNALL, J. (dissenting in part) — While I concur with my colleagues in believing that the initial protective frisk of Tanner Zachary Roy Russell was proper, I do not believe the State satisfied its burden of proving that Officer Derrick Makein was justified in opening the flashlight container once it became clear that the container did not contain a weapon. Accordingly, I would affirm the trial court's dismissal of the case and dissent from the majority opinion.

CONSENT TO SEARCH

As a preliminary matter, I believe whether a suspect has consented to the search of his person (and possessions) is a threshold question. If Russell consented to the search, the majority's analysis of the scope of Fourth Amendment protection afforded a suspect involved in a *Terry*[10] stop is unnecessary as the authority to search based on officer safety concerns arises only in situations where a suspect has not granted consent. "If it is not necessary to reach a constitutional question, it is well established policy that we should decline to do so." *State v. Speaks*, 119 Wn.2d 204, 207, 829 P.2d 1096 (1992). Here, Russell challenges the trial court's finding that he gave consent to search the container and, accordingly, I believe we have a responsibility to fully address this issue.[11]

_____

[10] *Terry v. Ohio*, 392 U.S. 1, 21-24, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[11] Russell assigned error to finding of fact 1.26. Russell may raise this issue even though he has not filed a cross appeal because he is not requesting affirmative relief but is, instead, arguing an additional ground for affirmance. *See* RAP 2.4(a); *State v. Kindsvogel*, 149 Wn.2d 477, 481, 69 P.3d 870 (2003); *State v. Bobic*, 140 Wn.2d 250, 257-58, 996 P.2d 610 (2000). The majority does acknowledge Russell's challenge to finding of fact 1.26 in a footnote, observing that the trial court's consent finding is based on "sketchy" evidence. Majority at 8 n.3.

Consent is one of the well-established exceptions to the warrant requirement. *See State v. Ferrier*, 136 Wn.2d 103, 111, 960 P.2d 927 (1998). The State must satisfy three requirements to show that a warrantless, consensual search was valid: (1) The consent must be voluntary, (2) the person granting consent must have authority to consent, and (3) the search must not exceed the scope of the consent. *State v. Walker*, 136 Wn.2d 678, 682, 965 P.2d 1079 (1998). At issue here is whether substantial evidence supports the superior court's finding[12] that Russell's consent to Officer Makein's search of the container was voluntary. It is the State's burden to show that consent to search was voluntarily given. *State v. Bustamante-Davila*, 138 Wn.2d 964, 981, 983 P.2d 590 (1999).

Whether consent was voluntary is a question of fact the superior court must determine from the totality of the circumstances. *State v. O'Neill*, 148 Wn.2d 564, 588, 62 P.3d 489 (2003). No single factor is dispositive, but the factors relevant to whether consent is voluntary include (1) whether *Miranda*[13] warnings, if applicable, were given before the defendant gave consent; (2) the defendant's degree of education and intelligence; and (3) whether the officers advised the defendant that he could refuse to consent. *State v. Reichenbach*, 153 Wn.2d 126, 132, 101 P.3d 80 (2004); *State v. Shoemaker*, 85 Wn.2d 207, 212, 533 P.2d 123 (1975). The court may also weigh any express or implied claims of police authority to search, previous illegal actions of the police, the defendant's cooperation, and police deception as to identity or purpose.

---

[12] Russell argues that the superior court improperly characterized this as a finding of fact and that it is actually a conclusion of law. But whether consent is voluntarily given is a question of fact. *State v. O'Neill*, 148 Wn.2d 564, 588, 62 P.3d 489 (2003).

[13] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

*Reichenbach*, 153 Wn.2d at 132. Although knowledge of the right to refuse consent and the giving of *Miranda* warnings are relevant, they are not necessary prerequisites to voluntary consent. *State v. Nelson*, 47 Wn. App. 157, 163, 734 P.2d 516 (1987). Further, the fact that an individual is in police custody does not alone establish coerced consent. *Nelson*, 47 Wn. App. at 163.

Here, Officer Makein testified that when he felt the container in Russell's pocket, he asked Russell if he "mind[ed]" if he (Makein) removed the container from his pocket, and Russell told Makein it was "[o]kay." Report of Proceedings (RP) at 18-19. Makein also asked Russell if he would consent to Makein's searching the container, and Russell did not "appear to have any problem" with that. RP at 19. This was the entirety of the evidence regarding Russell's consent.

Officer Makein did not testify that Russell actually consented to him (Makein) searching the container. Makein testified only that Russell did not "appear to have any problem" with the search. VRP at 19. Furthermore, there is no evidence in the record that (1) Makein advised Russell of his right to refuse or limit consent, (2) Makein advised Russell of his *Miranda* rights, or (3) established Russell's education or intelligence. And the record clearly shows that Makein had detained Russell and told him he was not free to leave before he (Makein) searched the container. Given that it was the State's burden to establish voluntary consent, I would hold that the record does not support a finding that Russell voluntarily consented to Makein's opening and searching the container.

SEARCH OF CONTAINER

I do not take issue with the majority's determination that Officer Makein was justified in frisking Russell in light of officer safety concerns and its application of *State v. Collins*, 121 Wn.2d 168, 847 P.2d 919 (1993), to this case. However, because I agree with the trial court that the State failed to establish that Makein reasonably believed Russell's flashlight container potentially concealed a dangerous weapon, I dissent. Contrary to the majority, I believe *State v. Horton*, 136 Wn. App. 29, 38, 146 P.3d 1227 (2006), *review denied*, 162 Wn.2d 1014 (2008), should guide our decision.

In *Horton*, Division Three of this court held that an officer's search of a cigarette pack for weapons exceeded the permissible scope of a *Terry* frisk. As this court explained,

> Incident to a *Terry* investigative stop, an officer may perform a superficial pat down of the outer clothing for weapons, if the particular circumstances present grounds for concern for officer safety. The protective search must be justified in scope throughout the duration of the search. *State v. Fowler*, 76 Wn. App. 168, 172, 883 P.2d 338 (1994) (citing *State v. Hudson*, 124 Wn.2d 107, 112, 874 P.2d 160 (1994))[, *review denied*, 126 Wn.2d 1009 (1995)].
> The officer may withdraw an object if it feels like it might be a weapon. [*Fowler*, 76 Wn. App. at 172-73.] But if the officer withdraws a cigarette pack under this rationale, the justification for the intrusion ends once he determines it is not a weapon. [*Fowler*, 76 Wn. App.] at 172-73. The court reached the same conclusion in *State v. Allen*, where the contents of a wallet were suppressed. *State v. Allen*, 93 Wn.2d 170, 172, 606 P.2d 1235 (1980); *see also* [*State v.*] *Broadnax*, 98 Wn.2d [289,] 297, 654 P.2d 96 [(1982), *abrogated by Minnesota v. Dickerson*, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993)].
> If we accept the State's argument, the scope of a *Terry* frisk is essentially unlimited, since the tiniest object can conceivably be used offensively. We find no authority for this proposition. And the State directs us to none. Only objects that feel like they could be used as weapons in a superficial pat down of the outer clothing may be removed and examined under *Terry*.
> Nothing in the particular circumstances here suggested that Mr. Horton's weapon of choice was likely to be a razor blade or paper clip. And the deputy could certainly have protected himself (the object of a *Terry* search) from miniature weapons by tossing the pack out of reach.

Significantly, the deputy testified that he routinely searches people for contraband as well as weapons: "You're going to search them for weapons and along with other things that may be harmful or that may be illegal." RP at 10. This, of course, is not the legitimate scope of a *Terry* frisk. *State v. Day*, 130 Wn. App. 622, 626, 124 P.3d 335 (2005), [*rev'd*, 161 Wn.2d 889, 168 P.3d 1265 (2007)]. The inside of the cigarette pack was, then, beyond the lawful scope of *Terry*.

*Horton*, 136 Wn. App. at 38-39.

Here, while Officer Makein's testimony established his concern that Russell's flashlight container may contain a miniature gun like the type he possessed during their earlier encounter, Makein acknowledged that the syringe inside the container weighed only a fraction of what the gun had weighed. Accordingly, after Makein removed the container from Russell's pocket, as in *Horton*, he knew the container did not contain a gun and it was unreasonable for him to search its contents. Although Makein suggested that the container could have contained some other weapon, the State presented no evidence establishing that this was a reasonable suspicion. And, as in *Horton*, if we "accept the State's argument, the scope of a *Terry* frisk is essentially unlimited, since the tiniest object can conceivably be used offensively." 136 Wn. App. at 38.

Officer Makein testified to no knowledge that Russell carried other weapons besides the small gun in the past, and there was no evidence during this particular contact that Russell was acting in a manner that suggested that he was a threat. Further, Makein never testified that he would have had any safety concerns had he returned the container to Russell after he (Makein) had finished issuing the traffic citations.

Because it was the State's burden at the suppression hearing to establish that the search of the container was proper, it was the State's responsibility to present evidence regarding whether Officer Makein would have been concerned for his safety once the contact ended had he returned

22

the container to Makein. *State v. Afana*, 169 Wn.2d 169, 177, 233 P.3d 879 (2010). The State failed to meet that burden here. Accordingly, I would hold that the superior court did not err when it concluded that the search of the container was improper because the record does not support the trial court's consent finding and once "any perceived threat to Officer Makein from the container was eliminated" expanding the scope of the search was unreasonable. Clerk's Papers at 76. I would affirm the trial court's suppression of the evidence and dismissal of the State's case against Russell.

QUINN-BRINTNALL, J.